Filed 9/10/15  P. v. Bui CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW VAN BUI,<br><br>    Defendant and Appellant. | B260295<br><br>(Los Angeles County<br>Super. Ct. No. GA090862) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jared D. Moses, Donald G. Umhofer, and Cathryn F. Brougham, Judges.  Affirmed.

Law Offices of Andy Miri and Andy Miri for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Andrew Bui appeals from a judgment entered after a jury found him guilty of two counts of sexual penetration by a foreign object, two counts of forcible rape, one count of forcible oral copulation, one count of rape accomplished by use of drugs, and one count of sexual penetration by a foreign object accomplished by use of drugs. Four of the offenses occurred during an encounter at Bui's home with one adult female victim, and the other three offenses one week later during an encounter at his home with another adult female victim. The trial court sentenced Bui to 30 years to life in prison.

Bui contends the trial court abused its discretion in declining to grant his motion to sever the four counts relating to one victim from the three counts relating to the other victim because the evidence demonstrated the first victim ingested a drink Bui made for her and became intoxicated while the second victim ingested very little of the drink Bui made for her and did not become intoxicated. Bui argues the evidence of him drugging the first victim was prejudicial on the counts involving the second victim.

Bui also contends the trial court erred in declining to exclude testimony regarding pretext telephone calls the victims made to Bui after the crimes under police supervision. Bui asserts he was compelled to testify in his defense in order to present exculpatory evidence regarding the pretext calls due to the court's evidentiary rulings concerning the calls. The prosecution did not elicit any testimony regarding the pretext calls during its case-in-chief. After Bui cross-examined the victims regarding the pretext calls, the prosecution presented evidence on rebuttal showing officers accidentally deleted the audio recordings of the calls.

For the reasons explained below, we find no error and affirm.

# BACKGROUND

**Preliminary Hearing Testimony**[1]

### J.

Victim, J. K., testified at the preliminary hearing. She stated she met Bui on or about August 24, 2013, when she went to the Honey Badger Café to study. Bui greeted J. when she entered the café. He seated her and also waited on her. Bui made conversation with J., telling her he was a hair stylist, makeup artist, and skincare and beauty consultant. He invited J. to contact him if she wanted to use his services. In the days following their first meeting, Bui and J. exchanged text messages. On August 26, 2013, Bui invited J. out to dinner with him and his friends. J. accepted the invitation.

J. arrived at Bui's home between 8:00 and 9:00 p.m. Neither Bui nor his friends were there so she sat on a wall in the backyard and waited. When Bui arrived, he lifted J. off the wall and carried her to his friend's car. Bui, his two friends, and J. went to a restaurant and ate dinner. J. did not drink any alcohol or take any drugs either before or during dinner. After dinner, they returned to Bui's home to watch a movie. Bui's friends left, and J. and Bui were alone in his bedroom. Bui's roommate was home, but not in the upstairs part of the house where Bui's bedroom was located.

J. sat on a futon in Bui's bedroom. Bui turned on his movie player, and closed his bedroom door. Bui asked J. if she wanted something to drink and she said she did. She told him she did not want a drink with alcohol in it because she had school the next day.[2] Bui said he would make her a special drink without alcohol. J. could not see the ingredients because Bui mixed the drink behind the door of a refrigerator in his room. J. saw Bui place something in the drink. Bui told her it was candy. Bui handed the drink to

---

[1] We summarize the relevant preliminary hearing testimony because, in deciding whether the trial court abused its discretion in denying Bui's pretrial motion to sever counts, "we examine the record before the trial court at the time of its ruling." (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

[2] At trial, J. stated she was 26 years old at the time of the incident.

J. and she tasted it.  The drink looked "pretty" and it tasted "fruity."  J. confirmed with Bui that he had not added alcohol to the drink and he assured her he had not.  J. consumed the drink in about a minute.[3]  Bui did not make a drink for himself but he took one sip of the drink he made for J..

Within minutes of finishing the drink, J. experienced sensations she had never felt before.  She felt very relaxed.  Time seemed to be moving more slowly.  Her thoughts slowed down.  Things did not seem real.  On prior occasions, she had consumed alcohol and it had never made her feel the way she felt after she consumed the drink Bui gave her.

Bui lifted J. off the futon and carried her to his bed.  Bui and J. began kissing.  The kissing was consensual and J. enjoyed it.  She felt "really good" and believed the sensations she was experiencing were due to the drink Bui gave her.  J. repeatedly asked Bui if he had put something in her drink and he continued to deny it.  She also told him she had to leave.  Bui told her she could not leave because she was incapable of driving, which confirmed her suspicion he had put something in her drink because she had not voluntarily ingested alcohol or drugs.  J. tried to get off the bed, but Bui pulled her back down.  She used her arms and legs to try to push him away, but she was unsuccessful.  She said, "'stop,'" but Bui continued to pull her down.  He told her to calm down.

Because Bui had told her she was not capable of driving, J. asked Bui to allow her to call a friend to come pick her up.  During her struggle with Bui, J. grabbed her cellular telephone from the futon and attempted to call and text her friend Nathaniel, but she did not reach him.

Bui restrained J. by "cradling" her like "a baby."  He placed his hand inside J.'s pants and penetrated her vagina with his fingers as she tried to push him away.  Then he removed her clothes as she said, "'no, stop,'" and continued trying to push him away.  After Bui removed his own clothes, he placed his penis inside J.'s vagina.  At that point, she surrendered and ceased resisting because she did not believe there was anything she

---

[3] At trial, J. stated the drink was about eight ounces.

4

could do to stop it.  She also experienced sensations she had never felt before, and noticed what he was doing "felt really good."

During the sexual intercourse, J.'s phone rang.  The call was from Nathaniel.  Bui stopped what he was doing.  J. was able to talk to Nathaniel and ask him to come pick her up.  Bui told J. he did not want her friend to know where he lived.  J. said she would not tell anybody where he lived if he let her go.  Bui walked out of his bedroom.  J. put on her clothes and ran out of Bui's house.

J. drove away from Bui's house and called Nathaniel to come and meet her.  Nathaniel drove her to the hospital for testing because she wanted to determine if Bui had drugged her.[4]  Two days later J. went to the police station and reported the crimes.

At the time of this incident, J. did not know the other victim, G. N.  J. met G. the day before the preliminary hearing.

During cross-examination, Bui's counsel asked J. about a recorded telephone call she made to Bui under police supervision a couple days after she reported the crimes (the pretext call).  The purpose of the call was to try to get Bui to admit he had drugged her drink.  During the call J. accused Bui of putting something in her drink.  Bui's counsel asked J. if Bui denied the accusation.  The trial court sustained the prosecutor's hearsay objection.


**G.**

Victim, G. N., also testified at the preliminary hearing.

Like J., G. met Bui in late August 2013 when she went to study at the Honey Badger Café where Bui worked.[5]  Over the next few days, they exchanged text messages.

---

[4] At trial, the emergency room doctor who examined J. that night testified the hospital where he examined her was not equipped to test for date rape drugs.

[5] At trial, G. testified that Bui was her waiter at the café.  He told her he was studying to cut hair and could help her highlight her hair.

Bui and G. arranged to meet on September 2, 2013 to study together. G. picked up Bui at his grandparents' house between 6:00 and 7:00 p.m., and drove to a coffee shop. They studied and talked for two to three hours. Bui invited G. to his house to watch a movie and she accepted the invitation. He told her he wanted her to try a mixed drink he had made before.

They arrived at Bui's house at about 10:00 p.m. Bui pointed out the city view and then walked G. upstairs to his bedroom. G. did not see anyone else at the house other than a man who was smoking outside. Bui closed his bedroom door and turned on his movie player.

Bui made G. a drink using ingredients he pulled from a small refrigerator in his bedroom. She could see him mixing the drink. She seemed to recall he told her what type of drink he was making but, at the time of the preliminary hearing, she could not remember what he said. Bui handed the drink to G. and she "took a sip out of courtesy." She might have taken another small sip before she handed the drink back to him. The drink "was very sweet." The one or two sips G. ingested did not cause her to become intoxicated or have any other effect on her. Bui drank some of the drink and set it down. They turned their attention to the movie.

Bui kissed G. on the cheek. She "blurted out" the "first thing that came to mind," which was, "my life is very complicated." Bui turned G.'s face and began kissing her lips. G. resisted and told Bui, "no, . . . I can't do this." At some point, Bui took a sip of the drink, kissed her, and "kind of forced it [the drink] down [her] throat." G. tried to push Bui away. He lifted her up over the futon and onto his bed. He continued to kiss her while she said "'no'" and tried to push him away. Bui wrapped his arms around G. and held her in a tighter grip. She repeatedly told him, "'no, I can't. I have to go home.'"

Bui began touching G.'s chest and vaginal area. She resisted and told him, "'no.'" She was scared and wondered if she would "ever be able to go home again." Bui removed G.'s shorts and underwear. She "continued to repeat that [she] had to go home and [she] couldn't go through with this." Bui did not stop. As G. raised her voice, Bui

6

tried to calm her down by saying something like, "'it's okay.'" Bui inserted a finger into G.'s vagina and also placed his mouth on her vagina. He removed his pants and inserted his penis into her vagina. She continued to ask him to stop but he refused. She tried to push him away but his grip on her was too tight.

Bui removed his penis from G.'s vagina and ejaculated onto her stomach. He retrieved a paper towel and cleaned her abdomen. G. grabbed her clothes and said she had to go home, but Bui did not let her leave. He pulled her hand and told her to follow him. She was afraid, and hoped he would let her leave if she complied. He led her to the shower where he washed her, inserting his fingers into her vagina under the running water. He dried her off with a towel and helped her get dressed. He placed her underwear in a bag, handed the bag to her, and told her not to put on the underwear.

Bui asked G. "to sit down with him and talk for a bit." G. repeatedly told Bui she needed to go home because her father would be angry. Five to 10 minutes later, Bui allowed her to leave. He asked her to call him to let him know she arrived home. When she did not call, he called her. She told him she was still driving. He called a couple more times, but she did not answer. She texted him stating she had arrived home, even though she did not go home.

G. drove to her friend Lance's house, and told him what happened. Then she went to an ex-boyfriend's house, and he told her she should go to the police station. She went home and talked to her brother. Her brother accompanied her to the police station. Thereafter, she submitted to a sexual assault examination.

G. had never met J. before she met her at the courthouse.

**Charges**

An information charged Bui with committing the following offenses against J. K. on or about August 26, 2013: sexual penetration by a foreign object (Penal Code, § 289, subd. (a)(1)(A);[6] count 1), forcible rape (§ 261, subd. (a)(2); count 2), rape accomplished

---

[6] Further statutory references are to the Penal Code.

7

by use of drugs (§ 261, subd. (a)(3); count 6), and sexual penetration by a foreign object accomplished by use of drugs (§ 289, subd. (e); count 7).

The information further charged Bui with committing the following offenses against G. N. on or about September 2, 2013: sexual penetration by a foreign object (§ 289, subd. (a)(1)(A); count 3), forcible oral copulation (§ 288a, subd. (c)(2)(A); count 4), and forcible rape (§ 261, subd. (a)(2); count 5).

With respect to counts 1-5, the information included the special allegation that Bui committed the offenses against more than one victim within the meaning of section 667.61, subdivisions (b) and (e), requiring punishment by imprisonment in state prison for 15 years to life.

**Motion to Sever Counts**

Bui filed a pretrial motion to sever the four counts relating to J. from the three counts relating to G.. He argued the legal theories pertaining to the two sets of charges are different because J. stated she became intoxicated from ingesting the drink Bui gave her, but G. stated she did not become intoxicated from ingesting the drink Bui gave her. Therefore, according to Bui's motion, "the defense of consent is fully applicable" to the charges relating to G., but "may be factually or legally limited or diminished" as to the charges relating to J.. Bui also argued trying "the dual allegations" in one case is "extremely prejudicial" due to "the danger that one or both of the [two sets of] charges will be tainted by leakage between the testimony presented as to each and the consequent danger that the jury will consider the evidence in the aggregate, rather than individually as to each incident." During oral argument on the motion, Bui further argued it was likely he would testify in his defense as to one set of counts but not the other.

The prosecution filed an opposition to the motion to sever counts, arguing joinder is proper here because (1) the incidents are connected in their commission "in that [Bui] used the same modus operandi," (2) the charged offenses "are of the same class of

8

crime," and (3) Bui cannot demonstrate joinder is prejudicial based on a consideration of the applicable factors.[7]

The trial court (Jared D. Moses, J.) denied the motion to sever counts, explaining the charged offenses are of the same class of crimes and joinder promotes judicial economy. The court also found evidence of the offenses committed against one victim would be cross-admissible in a separate trial of the offenses committed against the other victim under Evidence Code section 1108.[8]

**Motion Regarding Pretext Telephone Calls**

Bui filed a pretrial motion regarding the pretext telephone calls, which he styled as a "motion regarding spoliation of evidence by the prosecution." Bui explained: "The motion is based upon the fact that pretext telephone conversations with Mr. Bui, initiated and monitored by law enforcement, involving each of the two women claiming that [] they were raped, were deleted by an investigating detective. Accordingly the only available evidence concerning the content or credibility of the statements of the participants to those conversations, including Mr. Bui, are witnesses that are adverse to the defendant. It is clear that the prosecution intends to have their witnesses, who are adverse[] to the defense, testify as to their recollection of the contents of those September, 2013 calls. Therefore, it would appear that Mr. Bui may be compelled to take the stand in order to present his version of the conversations. Mr. Bui taking the witness

---

[7] "'The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case.'" (*People v. Scott* (2011) 52 Cal.4th 452, 469-470.)

[8] Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not admissible pursuant to Section 352." We discuss the applicability of this statute further below.

stand would not be necessary if the recordings had not been deleted, resulting in compelled waiver of his 5th amendment privilege not to take the stand." Bui stated he denied the rape accusations the victims made during the calls, but due to the erasure of the recordings, the jury would "be unable to evaluate the credibility of [his] denials from his verbal demeanor, and his attitude during the telephone conversations."

Bui asserted the remedies for spoliation under California law include (1) the "evidentiary inference that the evidence which one party has destroyed or rendered unavailable was unfavorable to that party," and (2) discovery sanctions "which can include the preclusion of the use of the evidence." He did not indicate in the motion which remedy he wanted the court to adopt. He also asserted, "The erasure of the audiotape of the two pretext calls, to the extent that it deprives the defense of valuable evidence is a clear due process violation."

The prosecution filed an opposition, urging the trial court to deny the motion under *California v. Trombetta* (1984) 467 U.S. 479 because the evidence was not exculpatory on its face, Bui could obtain comparable evidence by other available means (cross-examination of the investigating detectives), and there is no indication of bad faith on the part of law enforcement.[9] According to the opposition, both investigating detectives provided supplemental reports summarizing the pretext calls. The recordings of the calls were "inadvertently and accidentally erased" when a detective attempted to download the recordings. The prosecution argued there was no violation of Bui's Fifth Amendment rights merely because he had to choose whether to testify to present his version of the calls.

---

[9] "To establish a violation of his rights under *Trombetta*, it must be shown both that evidence with an exculpatory value apparent on its face was destroyed and that defendant could not obtain comparable evidence by any other available means." (*People v. Thomas* (2012) 54 Cal.4th 908, 929.) Law enforcement's failure to preserve potentially exculpatory evidence is not a due process violation unless the defendant establishes bad faith on the part of law enforcement. (*People v. Carter* (2005) 36 Cal.4th 1215, 1246.)

Bui's counsel explained at the hearing on the motion that the remedy he was seeking was exclusion of testimony regarding the pretext calls. The prosecutor informed the trial court she had not decided whether she planned to present testimony regarding the calls.

In making its ruling, the trial court (Jared D. Moses, J.) stated it was deeming the motion a *Trombetta* claim, and Bui's counsel agreed with this characterization of the motion. The court next stated: "And I agree with the People's position that first of all, if they choose not to get into this evidence, in my view, the defense can't get into it." Bui's counsel responded, "I agree." The court found the evidence had "an inculpatory aspect" in that Bui admitted during the calls that he had sex with the women, and "potentially an exculpatory aspect" in that Bui claimed the sex was consensual. The court concluded Bui could not establish a *Trombetta* violation because the evidence was not exculpatory on its face and there were witnesses available who could testify about the calls. The court also concluded Bui could not establish a due process violation based on the erasure of potentially exculpatory evidence because Bui could not demonstrate bad faith on the part of the detective. Thus, the court denied the motion.

At subsequent pretrial hearings on June 17-18, 2014, Bui renewed his objection to the prosecution's introduction of testimony regarding the pretext calls and asked the trial court (Donald G. Umhofer, J.) to exclude the testimony. Bui conceded the recordings were negligently erased and not intentionally destroyed. The court found the evidence was exculpatory in that Bui denied he had sex with the victims without their consent. Nonetheless the court denied Bui's motion to suppress testimony regarding the pretext calls because the court found Bui could obtain comparable evidence by other available means (the testimony of the officers and the victims).

**Trial, Verdicts and Sentence**

The case was tried before Judge Cathryn F. Brougham. J. and G. both testified at trial. The prosecution did not elicit testimony regarding the pretext calls during its case-in-chief.

11

During cross-examination of J., Bui's counsel asked her about the pretext call. This is the first time the issue of the pretext calls was raised by either party at trial. J. explained the police asked her to initiate a call to Bui to try to get him to admit he raped her. J. called Bui and accused him of putting a drug in her drink. When Bui's counsel asked J. about Bui's response to the accusation, the trial court sustained the prosecutor's objection on hearsay grounds. Later, outside the presence of the jury, the court explained to Bui's counsel there is no hearsay exception for the defense to introduce the defendant's statements.

During cross-examination of G., Bui's counsel asked her about the pretext call. G. stated she called Bui at the request of law enforcement to see if she could get him to admit to facts supporting the charges. Bui's counsel did not ask G. about Bui's response to the call.

J.'s friend, Nathaniel, and G.'s friend, Lance, testified at trial as fresh complaint witnesses regarding the victim's statements immediately after leaving Bui's home.

Emergency room doctor Edward Hernandez testified J. suspected she had ingested a date-rape drug. The hospital where J. was examined was not equipped to test for date rape drugs.

The prosecution called an expert who testified about the appearance, taste, and effects of date rape drugs. For example, liquid GHB is often mixed with fruit juice to hide its salty flavor. GHB in pill form can be disguised in a drink as candy.

Bui testified in his defense. He stated J. came back to his home after they went to a restaurant with his friends. His friends left and J. stayed. J. asked him to make her a drink after he opened the refrigerator in his room and she noticed the ingredients in there and the martini glass on top of the refrigerator. Bui was a bartender. He mixed J. a drink he made for family and friends containing ginger ale, Midori Melon Liqueur, pomegranate syrup, and a Japanese candy. Bui denied placing a drug in the drink. He described the drink as a "girly drink" which did not contain much alcohol. Bui and J. shared the drink and J. ate the candy.

12

According to Bui, after he and J. started watching a movie, they engaged in consensual sex. When they finished, J. got dressed and left his home. She was acting friendly. Bui noticed his wallet was missing. While he was looking for it, he received a call from J.'s phone with an angry man on the other end who said he knew where Bui lived. Bui later texted J. asking if she had taken his wallet.

Bui further testified, when he and G. went to the coffee shop to study, they spent about three hours in the parking lot kissing and touching each other before they entered the restaurant. After spending about one and one-half hours at the restaurant, they decided to go to Bui's home to watch a movie. Bui told G. he could mix her a drink that tasted better than the mojito he had purchased at the restaurant. After they arrived at his home, he mixed for G. the same drink he had mixed for J. and placed a candy in it.

Bui played a movie and he and G. began kissing. Bui initiated oral sex with G. and she consented. After they had consensual intercourse, they took a shower together, continuing their sexual relations. G. then got dressed and left Bui's home. G. later texted him to say she had arrived home.

During cross-examination of Bui, after Bui's counsel already had raised the issue of the pretext calls during his cross-examination of the victims, the prosecutor asked Bui questions about the pretext calls G. and J. made to him under law enforcement supervision. According to Bui, G. yelled during the pretext call, exclaiming, "say you did it" over and over. Bui kept repeating back, "no. I don't understand what you are talking about." He understood, however, G. was accusing him of taking advantage of her. During the pretext call with J., she repeatedly yelled, "you did it, say you did it. Admit it." Bui understood she was accusing him of having sex with her against her will and putting something in her drink. During the call, Bui denied J.'s accusations. Bui stated he was not mad at G. and J. when they made their accusations during the pretext calls.

On redirect examination, Bui testified further about the pretext calls. He stated he told G. during the call that he believed she wanted to have sex with him. He told J. during the call that the drink he made her "was just a wine cooler," and he did not put

anything else in her drink. He also told J. he believed the sex was consensual and he would "take responsibility" if she was pregnant.

On rebuttal, the prosecution called Detective Rebecca Minor, who assisted with G.'s pretext call. According to Detective Minor's testimony, during G.'s call, G. accused Bui of taking advantage of her and raping her, and Bui denied the accusations. Then Bui told G. he wanted "to show her how good he was sexually." Bui also told G. he did not hear her say no because the music and television were too loud, and he had attention deficit disorder and "he wasn't on his medication at the time." Bui did not seem angry or upset during the call. Detective Minor testified: "He expressed his desire to continue a relationship with her and he wanted to meet with her and sit down and talk with her and hold her hand and he was going to have to explain himself to her parents and her sister. . . ." Detective Minor prepared a report regarding G.'s pretext call.

Also on rebuttal, the prosecution called investigating Detective Arlene Guevara. She coordinated and listened to the pretext calls. The recordings of the calls were accidentally deleted when they were being downloaded. According to Detective Guevara's testimony, during J.'s call, J. confronted Bui about drugging her and having sex with her against her will. Bui did not seem angry or upset during the call. He told J. he would marry her if "he got her pregnant."

The jury found Bui guilty of all of the charged offenses (as listed above). As to counts 1-3 and 5 (sexual penetration by a foreign object, one count as to each victim, and forcible rape, one count as to each victim), the jury found true the multiple victim enhancement under section 667.61, subdivisions (b) and (e). As to count 4 (forcible oral copulation), the jury found the multiple victim enhancement to be not true.

The trial court sentenced Bui to a total term of 30 years to life in prison. Due to the multiple victim enhancement, the trial court sentenced Bui to an indeterminate term of 15 years to life on each of counts 1-3 and 5, with the sentence on count 2 to run concurrently with the sentence on count 1, and the sentence on count 5 to run concurrently with the sentence on count 3. On count 4, the court imposed a two-year

14

term to run concurrently with the sentence on count 3. On counts 6 and 7, the court imposed separate two-year terms to run concurrently with the sentence on count 1.

## DISCUSSION

**Denial of Motion to Sever Counts**

Bui contends the trial court abused its discretion in denying his motion to sever the four counts relating to J. from the three counts relating to G., and the error requires reversal.

Under section 954, different offenses occurring at separate times may be charged together in the same information if the offenses belong to the same class of crimes, as do the offenses charged in this case. Where, as here, joinder is permissible under section 954, a defendant moving to sever counts "has the burden to clearly establish a potential of prejudice sufficient to warrant separate trials." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.)

A trial court has broad discretion to deny a motion for severance because joinder of counts "ordinarily promotes [judicial] efficiency" and therefore "is the preferred course of action." (*People v. Scott*, *supra*, 52 Cal.4th at p. 469; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) In deciding whether the court abused its discretion in denying the motion, "we examine the record before the trial court at the time of its ruling." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) "'The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case.'" (*People v. Scott*, *supra*, 52 Cal.4th at pp. 469-470.) The fourth factor is not applicable here because this is not a capital case.

In considering the first of the factors listed above, we note cross-admissibility of evidence is not a hard and fast requirement for joinder of counts. As set forth in section 954.1, "In cases in which two or more different offenses of the same class of crimes or

15

offenses have been charged together in the same accusatory pleading . . . evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (§ 954.1.) Cross-admissibility of evidence is, however, a factor we consider in determining whether the trial court abused its discretion in denying a motion to sever counts. (*People v. Scott*, *supra*, 52 Cal.4th at p. 469.) "'"[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses."'" (*Id.* at p. 470.)

Here, pursuant to Evidence Code section 1108, evidence of the offenses committed against one victim would be cross-admissible in a separate trial of the offenses committed against the other victim. Under Evidence Code section 1108, evidence of the defendant's commission of an uncharged sexual offense may be admitted to prove the defendant's disposition to commit such a sexual offense so long as the probative value of the evidence is not "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" within the meaning of Evidence Code section 352. Here the probative value of the evidence is high given the similarity between the encounters: victim becomes acquainted with Bui while studying at the Honey Badger Café; after first meeting, Bui and the victim exchange text messages; Bui invites the victim out to eat at a restaurant and then to his home to watch a movie; Bui makes the victim a "special" drink; after foreplay, Bui lifts the victim from the futon to his bed; Bui engages in sex acts with the victim while she protests and resists. Bui cannot demonstrate the probative value is substantially outweighed by prejudice or any other factor listed in Evidence Code section 352.

Bui asserts "the factual situations are very different" and evidence regarding the encounter with the other victim is not cross-admissible because J. became intoxicated after she ingested the special drink Bui made for her while G. did not become intoxicated. There is substantial evidence Bui intended to drug G. like he drugged J. in that he

16

prepared the same special drink for G. and, after she only ingested one or two small sips, he tried to spit more of it into her mouth as he kissed her. Based on the similarity of the encounters, the cross-admissibility of the evidence weighs in favor of joinder of counts.

The second and third factors also weigh in favor of joinder because the charges relating to one victim were not "unusually likely to inflame the jury against" Bui as to the charges relating to the other victim (second factor), and there was not a material disparity between the strength of the evidence as to each victim (the third factor). (*People v. Scott*, *supra*, 52 Cal.4th at pp. 469-470.) Again, Bui relies on the evidence showing J. became intoxicated from the drink he gave her while G. did not, in arguing the second and third factors weighs in favor of severance. J.'s intoxication does not negate the similarity between the two encounters, nor does it render G.'s case any weaker.

For the foregoing reasons, Bui cannot demonstrate the trial court abused its discretion in denying his motion to sever the four counts relating to J. from the three counts relating to G..

Even if a trial court's denial of a motion to sever counts was correct when made, we "'still must determine whether, in the end, the joinder of counts . . . resulted in gross unfairness depriving the defendant of due process of law.'" (*People v. Soper* (2009) 45 Cal.4th 759, 783.) Bui does not address this standard in his briefing, and we find no gross unfairness resulting from joinder of these cross-admissible counts.

**Admission of Evidence of Pretext Calls**

Bui contends the trial court erred in denying his motion to suppress testimony regarding the pretext calls, and the "direct result of this ruling was that [he] was compelled to testify in order to get before the jury exculpatory evidence of what he had said during the pretext calls." This contention is meritless. Although Bui claims he wanted the court to suppress the testimony, and the denial of his motion to suppress the testimony prejudiced him, Bui is the party who first elicited testimony regarding the pretext calls. The prosecution did not introduce any testimony about the pretext calls during its case-in-chief and would not have been permitted to introduce such testimony on rebuttal if Bui had not opened the door by cross-examining the victims about the

17

pretext calls. Bui's decision to testify was unrelated to the court's denial of his motion to suppress the testimony he later elicited.

Bui next contends he was compelled to testify in violation of his Fifth Amendment right as a result of the trial court's refusal to allow the victims to testify on cross-examination about Bui's statements during the pretext calls. Bui has not pointed to any hearsay exception which would allow him to elicit his own out-of-court statements for their exculpatory value or the truth of the matter asserted.

Had he not first brought the issue of the pretext calls before the jury, Bui would not have faced having to decide whether to testify to present his version of the pretext calls. Bui's dilemma was one of his own making and not a result of any error by the court.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

LUI, J.

18